CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
March 31, 2025
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JUSTIN GODFREY FAHRINGER, ) | |
| Petitioner, ) | Civil Action No. 7:24-cv-00005 |
| ) | |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| CHADWICK S. DOTSON, ) | Chief United States District Judge |
| Respondent. ) | |

**MEMORANDUM OPINION**

Justin Godfrey Fahringer, by counsel, filed this petition for a writ of habeas corpus, 28 U.S.C. § 2254, challenging his 2018 convictions and 57-year sentence for fourteen felony sex crimes. (Habeas Pet., Dkt. No. 1.) Before the court are respondent's motion to dismiss (Dkt. No. 13) and petitioner's motion for a hearing (Dkt. No. 20). Fahringer has responded to the motion to dismiss. (Dkt. No. 19.) For the reasons stated below, the motion for a hearing will be denied, the motion to dismiss will be granted, and the habeas petition will be denied.

I. BACKGROUND

**A. Relevant Facts**

In denying a state habeas corpus petition filed by petitioner, the Supreme Court of Virginia recounted the following regarding the offenses in this case:

> The evidence adduced at trial demonstrates K.C. met petitioner and his friends, Matthew Moles and Jake Smith, at a bar. After drinking beer and playing pool together, petitioner suggested they leave the bar and continue drinking at Smith's apartment, which was located above the Deli Mart. At the apartment, everyone drank "an assortment of beer," and K.C. testified she and petitioner went downstairs to the Deli Mart to purchase additional beer. Smith observed "sexual things going on," elaborating that K.C. kissed petitioner and Moles at "some point." Smith also saw K.C. and petitioner enter the bathroom together and remain there for approximately fifteen minutes. Leah King, Smith's wife, did not see

K.C. kiss either man but saw her "kind of laying" on petitioner and "sitting on [Moles'] lap." K.C. testified she kissed Moles on the lips once while at the apartment; however, she declined Moles' repeated propositions for sex and complained to petitioner about Moles' advances.

Sometime between 1:00 a.m. and 1:15 a.m., Smith and King left their apartment to have drinks at another bar, locking their front door behind them as they left. Petitioner and Moles asked to stay behind, but Smith refused permission and told them to "leave the premises." At 1:14 a.m., Officer Scott Isom stopped petitioner, Moles, and K.C. on the Radford University campus on suspicion of public intoxication. The encounter was recorded on Isom's body camera, and the recording was introduced into evidence and played at trial. Isom testified K.C. was having trouble walking, and petitioner and Moles appeared to be assisting her. Although K.C. provided Isom her name, age, and identification, she had trouble standing during the encounter and eventually sat on the sidewalk and "slump[ed] forward." Isom told them they could go if they found a ride home.

Around 1:40 a.m., Joseph Tolbert and Sarah Jones picked up petitioner, Moles, and K.C. in a Hyundai Santa Fe SUV and drove them back to Smith's apartment, about 200 yards from where the trio was stopped by Isom. Petitioner sat in the SUV's backseat with K.C. and Moles. During the two-to three-minute drive, Tolbert noticed K.C. "kissing" both men, but he could not recall if it was on the lips or the cheek.

A thirty-minute surveillance video, recorded from both a camera overlooking the alleyway beside the Deli Mart and a camera overlooking an alcove at the rear of the store, was admitted at trial and shown in its entirety to the jury. The video evidence showed that around 1:54 a.m., K.C. was struggling to walk and stand in the alleyway, at times holding onto petitioner and Moles for balance before ultimately stumbling and falling to the ground. K.C. testified the next thing she remembered was laying on her back with her shoes, pants, and underwear removed, and petitioner and Moles were performing oral sex and penetrative intercourse on her. Indeed, the video evidence showed petitioner and Moles lifting K.C. up after she had fallen in the alleyway, dragging her toward the rear of the Deli Mart, then carrying her into the alcove behind the building. There, the video evidence showed, petitioner and Moles removed K.C.'s shoes and pants and took turns engaging in sexual acts with her while she appeared to be unconscious or nearly unconscious. K.C. testified she was "fading in and out of consciousness" but recalled telling the men to stop. K.C. also testified she did not

2

> voluntarily perform fellatio on either man but that she "was told to" do so.
>
> Two passersby saw the attack and called the police to report a "rape in progress." When Officer Mark Mills arrived at the alcove behind the Deli Mart, he saw K.C. bent over with petitioner and Moles surrounding her. The video evidence showed petitioner stand, begin to walk toward Mills' police cruiser, and raise his hands. Mills testified petitioner appeared "to be zipping his pants up" before raising his hands in the air. The video evidence also showed Moles stand briefly, and Mills testified both men complied with his directive to get on the ground. Mills testified K.C. "slumped over and fell to the ground" and had no "lower garments on at all." He further described her as "very intoxicated" insofar as she was disoriented and confused, had slurred speech and glassy eyes, and emanated a strong odor of alcohol. A preliminary breath test indicated K.C.'s blood alcohol content was .23. She eventually was taken to the hospital, where she was evaluated by a sexual assault nurse examiner. She was tearful and anxious the entire time she was at the hospital.
>
> The police interviewed petitioner twice on the morning of his arrest, and recordings of both interviews were played at trial for the jury. During the first interview, petitioner stated he, Moles, and K.C. were simply "fooling around" in the alcove but denied that he had his pants down or that he touched K.C. below the waist. He repeatedly denied engaging in oral sex or intercourse with K.C. During the second interview, petitioner admitted having oral sex with K.C. but continued to deny having intercourse with her. He insisted K.C. was in control of her faculties and that the activities between them were consensual. The jury found petitioner guilty of all offenses.

(Resp't's Ex. G at 2–4.)

**B. Procedural Background**

Fahringer was convicted by a jury in the Circuit Court for the City of Radford, Virginia, of fourteen felony sexual crimes against K.C., including abduction with intent to defile, rape, aggravated sexual battery, two types of forcible sodomy, conspiracy to commit the offenses, and participation in the offenses as a principal in the second degree. The jury fixed the sentence at a total of 57 years, a term subsequently imposed by the trial court. The final judgment order was

3

entered on February 23, 2018.  (Resp't's Ex. A.)

On appeal, Fahringer challenged the trial court's ruling that denied a proffered jury instruction regarding consideration of defendant's recent prior sexual conduct with a victim in determining force, threat, intimidation, or the victim's mental incapacity or physical helplessness.  The Virginia Court of Appeals granted an appeal and affirmed in a published opinion.  *Fahringer v. Commonwealth*, 827 S.E.2d 1 (Va. App. 2019).

Fahringer then filed an appeal in the Supreme Court of Virginia.  On January 22, 2020, that court dismissed the appeal pursuant to Rule 5:17(c)(1)(iii).  The Supreme Court ruled that the Assignment of Error in the petition for appeal was insufficient.  (Resp't's Ex. C.)  By new appellate counsel, petitioner sought a delayed appeal under Virginia Code § 19.2-321.2.  The Supreme Court of Virginia granted him a delayed statutory appeal by order dated August 6, 2020.  (Resp't's Ex. D.)

A different attorney filed a new petition for appeal.  The Supreme Court refused the petition on May 19, 2021.  (Resp't's Ex. E.)[1]

Then, Fahringer pursued a state habeas petition *pro se*.  The petition was executed on March 25, 2022, and sent to the Supreme Court of Virginia on April 13, 2022.  The petition raised claims for ineffective assistance of counsel, a *Brady* and *Giglio* violation due to the prosecutor's failure to produce exculpatory and impeaching video footage, and a violation of *Napue v. Illinois* because the prosecutor's main witness committed perjury.  After briefing, the Supreme Court denied and dismissed the state habeas petition.  (Resp't's Ex. G.)  The Court determined that petitioner failed to satisfy either prong of the analysis under *Strickland v.*

---

[1] Fahringer also filed a *pro se* habeas petition in the United States District Court for the Eastern District of Virginia which he labeled an appeal from the Supreme Court of Virginia.  The petition was denied without prejudice on March 26, 2020.  *See* Case No. 1:20cv00234 (E.D. Va.)

4

*Washington*. The Court rejected the *Brady* claim as a misapprehension that the duty of the prosecution includes introduction of exculpatory evidence at trial rather than disclosure of such evidence to the defense. The Court found that Fahringer was aware of the content of the evidence in question as he knew that a surveillance camera was filming the actions in front of the Deli Mart. Finally, the Supreme Court denied petitioner's *Napue* claim as procedurally barred under *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974). (Resp't's Ex. G.)

In addition, the Supreme Court rejected as procedurally barred under Virginia Code § 8.01-654(B)(2) and Rule 5:7(e) an allegation that had counsel properly investigated and introduced the additional videos at trial, the trial court would have granted the requested prior sexual conduct jury instruction and rejected a contention that the prosecutor had a duty under *Brady* and *Giglio* to specifically identify the storefront or arrest videos as exculpatory. The Court found that Fahringer improperly presented these allegations for the first time in his reply to the motion to dismiss without leave of court. (*Id.*)

A petition for rehearing was denied by the Court on June 29, 2023.

## II.  ANALYSIS

**A. Fahringer's Claims**

Fahringer alleges the following claims: (1) counsel failed to present (or investigate and present) the videos and still shots of the "front entrance" of the Deli Mart, as well as the last 11 seconds of the arrest video (*see* Habeas Pet., DVD Exhibit); (2) by failing to present (or investigate and present) said evidence, counsel deprived petitioner of the highly favorable evidence and the reasonable inferences to be made from that evidence. Counsel unreasonably failed to argue these same factors consistent with the presumption of innocence and the standard of guilt beyond a reasonable doubt; and (3) without this evidence, counsel could not make the

5

appropriate arguments to the jury that naturally would flow from that evidence. In the absence of this video evidence, counsel could not make the necessary arguments to the jury regarding the sequence of events and how the "missing" evidence impacted the accurate understanding of the timeline. (Habeas Pet. 20.)[2]

**B. Exhaustion and Procedural Default**

A state prisoner must exhaust his remedies in state court before seeking habeas corpus relief in federal court. 28 U.S.C. § 2254(b). A federal court "may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000). Further, the petitioner must present to the state court the same operative facts and the same controlling legal principles that he seeks to present to the federal court. *Kasi v. Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002). Failure to do so "deprive[s] the state court of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A petitioner must also present his federal claims to the appropriate state court in the manner required by the state court, so as to give the state court "a meaningful opportunity to consider allegations of legal error." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986). A state prisoner does not "fairly present" a claim for exhaustion purposes when the claim is raised in "a procedural context in which its merits will not be considered." *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

"A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if

---

[2] Fahringer requests a hearing because the issues are "complex" and to allow the parties to articulate their positions and answer any questions of the court. (Dkt. No. 20.) Petitioner does not request an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2). *See Winston v. Kelly*, 592 F.3d 535, 551–52 (4th Cir. 2010). The court finds that oral argument is not necessary as the issues are adequately presented in the parties' briefs.

the petitioner attempted to present it to the state court." *Baker*, 220 F.3d at 288; *see Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (describing the procedural default doctrine as a "distinct but related limit on the scope of federal habeas review"). Simultaneous exhaustion and procedural default occur "when a habeas petitioner fails to exhaust available state remedies and 'the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 735 n.1). In that case, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Baker*, 220 F.3d at 288.

Respondent concedes that the portions of Fahringer's claims where he alleges that trial counsel was ineffective for failing to investigate and then introduce the videos at trial were presented to the Supreme Court of Virginia in the state habeas petition and rejected on the merits. Thus, those claims were exhausted and are ripe for consideration in this court. However, respondent argues that the portion of Fahringer's claim where the petitioner argues that counsel failed to argue helpful facts and inferences to the jury that could be gleaned from those videos was not presented to the state court. The court disagrees because the latter would logically follow from the former: if trial counsel failed to investigate or present the videos at trial, then counsel obviously did not argue any inferences from the videos because he did not present the videos as evidence at trial. If there were no benefit from introducing the videos, then there would be no argument that trial counsel was ineffective for failing to investigate them. In other words, it appears to the court that Fahringer presented the operative facts to the state court, which involve counsel's failure to present the videos at trial, and the legal principles would be the same

7

under *Strickland*. Therefore, the court does not consider this claim to be procedurally defaulted,[3] and the court rejects respondent's exhaustion argument.[4]

**C. Merits Standard of Review**

Pursuant to § 2254(d), "a petitioner is entitled to relief only if the state court adjudication of their claim was [1] 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court'; or [2] 'based on an unreasonable determination of the facts in light of the evidence presented.'" *Allen v. Stephan*, 42 F.4th 223, 246 (4th Cir. 2022) (quoting 28 U.S.C. § 2254(d)). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review to factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, 576 U.S. 257, 276 (2015).

"Clearly established Federal law" for purposes of § 2254(d)(1) includes only "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). "A state court's decision is 'contrary to' clearly established federal law under § 2254(d)(1) when it 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'decides a case differently than [the Supreme Court] has on a set

---

[3] Fahringer has also argued that counsel's failure to introduce the video tapes deprived him of the opportunity to secure the model jury instruction addressing prior sexual conduct. (Habeas Pet. at 22, 31, 39–40.) The Supreme Court of Virginia found that this claim was "not properly before the Court" because the facts "were known to petitioner at the time he filed his habeas petition, and petitioner did not request leave to amend his petition." (Ex. G at 9.) Accordingly, this aspect of his claim appears to be procedurally defaulted, *see Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008), although this seems to be a matter of state law in any event, *see Grandison v. Corcoran*, 78 F. Supp. 2d 499, 507 (D. Md. 2000); *Bates v. Lee*, 308 F.3d 411, 420 (4th Cir. 2002). However, to the extent that this claim is simply an aspect of the prejudice component of Fahringer's *Strickland* claim that counsel was ineffective for not introducing the videos, it appears to the court that it would not be procedurally defaulted, but it lacks merit for the reasons stated elsewhere in this opinion.

[4] Accordingly, the court finds that it is not necessary to address Fahringer's argument that exhaustion should be excused under *Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (providing that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective").

of materially indistinguishable facts.'" *Allen*, 42 F.4th at 246 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). A state court's decision is an "unreasonable application" of clearly established federal law if the state court correctly identified the governing legal principle but "'unreasonably applie[d] that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413). This standard is meant to be "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "'The ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Allen*, 42 F.4th at 246 (quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017)). The petitioner "must show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

A state court's factual determinations, meanwhile, "are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence." *Allen*, 42 F.4th at 246 (citing 28 U.S.C. § 2254(e)(1)). A state court's decision is based on an "unreasonable determination of the facts in light of the evidence presented" under § 2254(d)(2) when it is "'sufficiently against the weight of the evidence that it is objectively unreasonable.'" *Id.* (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)).

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, the court looks to the last reasoned state court opinion. *See Lewis v. Clarke*, CASE NO. 7:20CV00421, 2021 WL 1541034, at *5 (W.D. Va. Apr. 20, 2021) (citing *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)). In this instance, the relevant opinion and findings of fact are from the Supreme Court of Virginia's dismissal of petitioner's state habeas petition on April 6, 2023. (Resp't's Ex. G.)

9

**D. Ineffective Assistance of Counsel**

When a state prisoner seeks § 2254 relief for ineffective assistance of counsel, courts apply the "highly deferential" *Strickland* standard. *Owens v. Stirling*, 967 F.3d 396, 412 (4th Cir. 2020); *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court set forth a two-part test to evaluate ineffective assistance of counsel claims. First, the petitioner must show counsel's performance was deficient and fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687–88. Second, the petitioner must show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Counsel gets the strong presumption that he or she rendered "adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 22 (2013).

"AEDPA and *Strickland* thus provide 'dual and overlapping' lenses of deference, which we apply 'simultaneously rather than sequentially.'" *Owens*, 967 F.3d at 411. "This double-deference standard effectively cabins our review to a determination of whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Morva v. Zook*, 821 F.3d 517, 528 (4th Cir. 2016). "Section 2254(d) codifies the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. Thus, surmounting *Strickland*'s high bar is never an easy task. But establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Valentino v. Clarke*, 972 F.3d 560, 581 (4th Cir. 2020) (internal citations omitted).

The court considers the claims presented by Fahringer in this federal habeas matter to be *Strickland* ineffective assistance of counsel claims. The Supreme Court of Virginia addressed those claims as follows:

> In claim (a), petitioner contends he was denied the effective assistance of counsel because counsel failed to investigate certain 'highly exculpatory' surveillance videos and failed to introduce this evidence at trial. In support of this claim, petitioner attaches to the petition a compact disc ('CD') labeled 'Lawyer Letters Missing Footage' containing the videos in question, which include recordings from two surveillance cameras outside the front of the Deli Mart ('the storefront videos') and approximately eleven seconds of additional video from the surveillance camera overlooking the alcove behind the Deli Mart depicting petitioner's arrest that had not been shown at trial ('the arrest video') (collectively, 'the additional videos'). Petitioner claims the additional videos show petitioner and K.C. 'minutes before' the offenses, during which time she was 'walking, talking, laughing, and engaging in consensual sexual activity' with petitioner. Petitioner asserts the Commonwealth provided the additional videos to counsel during discovery, but counsel was 'unable to open and play' them. Petitioner faults counsel for failing to hire a computer specialist to view the additional videos in preparation for trial. Rather, petitioner contends, counsel waited until after petitioner's convictions to watch the additional videos which 'had been in [counsel's] possession the entire time.' Petitioner contends that, had counsel viewed the additional videos prior to trial and introduced them into evidence, the jury would have found K.C. was not mentally incapacitated at the time of the offenses but, rather, willingly consented to the sexual activity. Consequently, the jury would have acquitted petitioner.
>
> The Court holds claim (a) satisfies neither the 'performance' nor the 'prejudice' prong of the two-part test enunciated in *Strickland*[]. The record, including the trial court manuscript record, the trial transcripts, the CD attached to the petition, counsel's affidavit in response to petitioner's claims, the prosecutor's affidavit, and the exhibits attached to petitioner's reply, demonstrates that in 2019, following petitioner's unsuccessful appeal to the Court of Appeals, counsel wrote several letters to petitioner regarding the evidence in this case. In May 2019, counsel sent petitioner 'a complete and full copy of the record and [his] file.' In June 2019, counsel sent petitioner a DVD containing counsel's 'only copies' of the video evidence in the case. In doing so, counsel

11

explained he would 'no longer maintain a copy.' In September 2019, in response to communication from petitioner, counsel disputed the notion that he had not exhaustively researched petitioner's case and reviewed all the evidence. Counsel concluded his letter by stating, 'Again, I CANNOT see the video files. Send them to me and I will review them.' In early October 2019, counsel informed petitioner that '[s]omeone delivered a copy of the missing video clip after hours' and that he would review the matter. In late October 2019, after researching 'after discovered evidence,' counsel advised petitioner 'the most difficult [issue] to overcome' in seeking a new trial was the materiality of the additional videos. Counsel stated it would be 'nearly impossible' to demonstrate the additional videos would produce a different result at another trial, noting the videos did not address evidence of K.C.'s intoxication (i.e., her extremely high blood alcohol content, not moving for several minutes during the videos, and being carried by Moles and petitioner from the alleyway into the alcove).

In his affidavit, counsel asserts he reviewed 'video evidence' at the prosecutor's office prior to trial, as well as visited petitioner in jail prior to trial to review 'video footage' on at least four occasions. Counsel also asserts that, during another pretrial jail visit on January 20, 2017, he reviewed the additional videos from the Deli Mart with petitioner. Further, counsel explains the video files he told petitioner he could not play were those that an unknown person had dropped off at his office after hours on a disc labeled 'missing Deli Mart footage.' Counsel initially advised petitioner he could not view the contents of the disc. However, counsel was eventually able to play the videos and recalled he had seen 'many' of the videos previously, but not all. He further recalled weighing the detrimental effect of the clips prior to trial.

The prosecutor has submitted an affidavit in which he asserts the Commonwealth had 'open-file discovery' with petitioner's counsel. The prosecutor contends counsel was permitted to view all documents in the Commonwealth's file and that counsel was provided with 'all digital media in the case.'

The storefront videos on petitioner's CD were recorded by two surveillance cameras outside the front of the Deli Mart, labeled 'Front Entrance 1' and 'Front Entrance 2.' The storefront videos show that, around 1:45 a.m, a white SUV exited a parking area next to the building where the Deli Mart and Smith's apartment were located. Several seconds later, petitioner, Moles, and K.C. approached the front door to Smith's apartment from the same parking area that the SUV had recently departed. K.C. held on to

Moles for balance as petitioner unsuccessfully attempted to open Smith's front door. Unable to stand in one place on her own, K.C. shuffled and stumbled before reaching out to Moles for support. K.C. began leaning backward and away from Moles as he kissed her neck, at which point petitioner approached K.C. from behind and appeared to spank her and kiss her neck. Seconds later, K.C. leaned away from the two men by reaching for the front door to the apartment, but Moles repositioned his body in front of K.C. He then grabbed her around the neck and kissed her, and petitioner again approached K.C. from behind. The kissing continued for several minutes, even as K.C.'s head fell backward, and at times petitioner stepped away excitedly and jumped up and down.

On multiple occasions, while K.C. struggled to stand upright, petitioner appeared to thrust his hips toward her from behind. Moles also appeared to push K.C. onto her knees and hold her head in front of his groin, at which point petitioner began looking around and touching his groin. Miles and petitioner prevented K.C.'s attempt to stand up, instead turning her around to perform fellatio on petitioner. After several seconds, Moles, who was then behind K.C., lifted her into a standing position, wrapped his arms around her body, and began kissing her neck. After zipping his pants, petitioner approached K.C. from the front and reached for her groin. Every time K.C. attempted to move her body away from Moles, Moles brought her back close to him. Eventually, petitioner kissed K.C. then pointed to a surveillance camera (Front Entrance 2) and smiled at the camera. When K.C. saw the camera, she pounded petitioner's chest and began walking away from the men. Moles walked alongside with his arm either around her neck or on her back, and petitioner was one step behind. Around 1:54 a.m., petitioner carried K.C. into the alleyway beside the Deli Mart.

The arrest video on petitioner's CD contains eleven additional seconds of surveillance video following Officer Mills' arrival at the alcove behind the Deli Mart. This eleven-second portion of the video, which was not included in the Commonwealth's video evidence at trial, shows petitioner on the ground with Mills standing in front of him. The video shows Moles also on the ground. K.C.'s hands were visible, but it is unclear whether she was standing, sitting, or lying on the ground.

A petitioner seeking habeas relief on the basis of ineffective assistance bears the burden of proving his claim . . . . Here, contrary to petitioner's assertions, the record demonstrates counsel not only was provided all of the digital medial in the case during discovery, but also that he reviewed those videos—including the additional

13

> videos—with petitioner prior to trial. Additionally, petitioner misreads counsel's 2019 letters, in which counsel stated he was unable to play 'the video files.' By the time petitioner brought the additional videos to counsel's attention, counsel had already sent petitioner his only copies of the video evidence in the case. Consequently, counsel would not have been able to play any video evidence from the case unless it was provided to him. Moreover, as counsel explains, he had difficulty playing the disc that petitioner brought to his attention after the trial concluded, not the videos that were provided to him in discovery, which included the portions of the videos petitioner faults counsel for failing to play at trial. Indeed, when counsel eventually viewed the disc containing the additional videos, he recognized them from the videos he had reviewed and evaluated prior to trial.
>
> Moreover, given the depictions on the additional videos of K.C.'s state and the actions of petitioner and Moles, as described above, counsel could have reasonably concluded the additional videos were not exculpatory but, rather, supported the conclusion the sexual acts were not consensual and that K.C. was mentally incapacitated. Therefore, counsel could have reasonably concluded the better defense strategy was to not introduce the additional videos into evidence. To be sure, counsel advised petitioner in late October 2019 it would be 'nearly impossible' to demonstrate the additional videos would have yielded a different result had they been presented at trial because they did not refute the evidence of K.C.'s mental incapacity. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

(Resp't's Ex. G at 4–8.)

Fahringer's claims are premised on his counsel's purported failure to present at trial the videos described herein by the Supreme Court of Virginia. The court agrees that petitioner cannot satisfy either prong of the *Strickland* analysis. First, the Supreme Court found that counsel had seen the videos prior to trial and had reasonably concluded that the better strategy was not to introduce them at trial, given their contents. Second, and given their contents, Fahringer cannot establish prejudice because the videos were not exculpatory. Petitioner's arguments about "appropriate arguments" and the "sequence of events" cannot overcome the

14

double deferential standard that the court must apply in this instance. (*See* Pet'r's Br. ¶ 2, Dkt. No. 19.) Deciding not to play the videos based on the incriminating content of the videos is a reasonable strategy and a reasonable argument for passing muster under the *Strickland* standard for deficient performance.

      Fahringer disputes the Supreme Court's characterization of the evidence on these videos. He argues that the videos show that K.C. was "voluntarily engaging" in sexual acts and acting "playfully" while "laughing and smiling." She was, according to petitioner, alert and aware of the circumstances, understood exactly what was going on, and "fully capable of making decisions for herself." (Pet'r's Br. ¶¶ 4, 5; *see* Habeas Pet., DVD Exhibit.) This characterization is undermined by the other evidence that was presented at trial. For example, officers described K.C. as intoxicated and disoriented. (*See* Ex. A1, A2, Tr. 84, 89.) The preliminary breath test on K.C. showed a .23 blood alcohol level after Fahringer and Moles had been detained. (Tr. 89.) Additionally, the jury saw body-warn camera footage from Officer Isom (Tr. 161), where K.C. was "visibly swaying; she's stumbling." (Tr. 167.) Officer Isom testified at the trial that K.C. was "extremely intoxicated" and had difficulty walking. (Tr. 151–52, 170.) Shannon Davis, a college student who saw the attack in progress, testified that K.C. "looked too messed up to do anything." (Tr. 107.) And K.C. testified that she was "too intoxicated to stand" and was "fading in and out of consciousness" during the attacks. (Tr. 196, 200.) In sum, Fahringer's generous interpretation of these videos does not rebut, by clear and convincing evidence, the factual determinations made by the Supreme Court of Virginia, *see* 28 U.S.C. § 2254(e)(1), and the corresponding finding that petitioner cannot establish that he was prejudiced by the absence of the videos at trial.

Additionally, the court has viewed the videos and agrees with respondent's characterization that they "unquestionably show [K.C.]'s high level of inebriation and the petitioner and Moles taking advantage of that condition." (Resp't's Br. ¶ 44, Dkt. No. 14; Habeas Pet., DVD Exhibit.) The contents of the videos do not contradict the Supreme Court of Virginia's finding that "counsel could have reasonably concluded the additional videos were not exculpatory but, rather, supported the conclusion the sexual acts were not consensual and that K.C. was mentally incapacitated." (Resp't's Ex. G at 7.)

For these reasons, Fahringer's claims will be dismissed.

### E. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant" on a § 2254 petition. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner has failed to make the requisite showing. Therefore, the court declines to issue a certificate of appealability. However, Fahringer may still ask the United States Court of Appeals for the Fourth Circuit to issue such a certificate. *See* Fed. R. App. P. 22(b).

### III. CONCLUSION

For the reasons stated in the foregoing opinion, the court will issue an appropriate order denying the request for a hearing, granting respondent's motion to dismiss, denying Fahringer's § 2254 petition, and declining to issue a certificate of appealability.

Entered: March 31, 2025.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge